9IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| MARK A. LOVASZ,<br><br>              Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>              Defendant. | CASE NO. 1:23-CV-309-AMK<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Mark A. Lovasz ("Plaintiff" or "Mr. Lovasz") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 8.)  For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

### I.      Procedural History

Mr. Lovasz filed his DIB and SSI applications on March 29, 2020, alleging a disability onset date of December 15, 2019.  (Tr. 61.)  He asserted disability due to neuropathy in feet, frozen shoulder LT RT, RT hand issues with motor skills, body swelling causes pain, diabetes type 2, memory problems, fatigue, pain.  (Tr. 249, 259.)  Mr. Lovasz's application was denied at the initial level September 28, 2020 (Tr. 290-99) and at the reconsideration level on January 4, 2021 (Tr. 302-09).  He then requested a hearing before an Administrative Law Judge ("ALJ").

1

(Tr. 311.)   A telephonic hearing was held before an ALJ on January 6, 2022. (Tr. 61, 85-125.) The ALJ issued an unfavorable opinion on January 27, 2022.  (Tr. 58, 63, 79.)

Mr. Lovasz's request for review of the decision by the Appeals Council was denied on December 14, 2022 (Tr. 1-7), making the ALJ's decision the final decision of the Commissioner. Mr. Lovasz filed his Complaint seeking judicial review on February 16, 2023.  (ECF Doc. 1.) The case is fully briefed and ripe for review.  (ECF Docs. 8, 10, 11.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Mr. Lovasz was born in 1980 and was 39 years old on the alleged disability onset date, making him a younger individual under Social Security regulations.  (Tr. 78.)  He had at least a high school education.  (*Id*.)  Mr. Lovasz has not engaged in substantial gainful activity since the alleged onset date.  (Tr. 63.)

### B.     Medical Evidence

Although the ALJ identified numerous physical and mental impairments (Tr. 64), Mr. Lovasz focuses his argument on a January 2021 "Off-Task / Absenteeism Questionnaire" where the medical opinion was explicitly based on Mr. Lovasz's diabetic neuropathy, post-concussion syndrome, foot pain, and medication side effects (*see* ECF Doc. 8; Tr. 1401).  The evidence summarized herein is therefore focused on the evidence relevant to the conditions that formed the basis for that January 2021 medical opinion.

#### 1.     Relevant Treatment History

Mr. Lovasz saw his primary care provider Stephen Archacki, M.D., Ph.D., on August 2, 2019, regarding a right foot injury that he sustained three days prior while jogging.  (Tr. 1240.) An x-ray of his right foot revealed a fracture of the right fifth metatarsal.  (Tr. 1241, 1244.)

On December 13, 2019, Mr. Lovasz saw Dr. Archacki for a diabetes checkup.  (Tr. 1258.)
He reported that he suffered from neuropathy, noting it could get "very bad."  (*Id*.)  He also
relayed that he had tried working less and was "even offered disability but turned it down."  (*Id*.)
On physical examination, he was in no acute distress and had no deformities, ulcers, or calluses
on his feet. (Tr. 1258, 1260).  Dr. Archacki's diagnoses included hypertension (controlled),
hypercholesterolemia, diabetes (controlled), and anxiety with depression.  (Tr. 1260.)

On December 17, 2019, Mr. Lovasz presented to podiatrist Timothy J. Levar DPM, for
re-evaluation of a Jones fracture of the fifth metatarsal of his right foot, which he had injured
while jogging in August. (Tr. 648.)  He had been wearing a fracture boot and using an external
bone stimulator since fracturing his right foot in August, but complained of significant pain in his
foot; the pain was daily and constant with standing and walking.  (*Id*.)  His physical examination
revealed edema in his right foot, absent protective sensation to the left and right hallux, and
diminished vibratory sensation at the hallux IPJ. (Tr. 649.)  His motor strength and range of
motion were normal, but he demonstrated localized pain over the proximal fifth metatarsal.  (*Id.*)
X-rays of his right foot revealed a fracture of the fifth metatarsal with non-union, including
sclerotic fracture margins.  (*Id*.)  Mr. Lovasz and Dr. Levar discussed potential risks of surgery,
with additional risk due to his history of diabetes and neuropathy, but agreed that surgical
intervention was necessary.  (Tr. 650.)

On January 8, 2020, Dr. Levar performed an underwent an open reduction, internal
fixation (ORIF) a fifth metatarsal fracture with non-union on his right foot.  (Tr. 635-37.)  At a
January 21, 2020 post-operative follow-up, Mr. Lovasz reported that he was doing well, had no
acute complaints, and that his pain was well controlled.  (Tr. 630.)  On neurological examination,
his sensation was grossly intact and his motor strength was preserved.  (Tr. 631.)

On April 30, 2020, Mr. Lovasz initiated care with neurologist Joshua J. Sunshine, M.D., for treatment of neuropathy; he also complained of memory loss following a concussion.  (Tr. 828.)  As to neuropathy, Mr. Lovasz explained that he experienced an electrical shock at work in 2016, after which he lost feeling in his feet and had limited movement in his hands; prior to that, he had some mild neuropathy.  (*Id*.)  As to memory loss, he said he had a concussion in March 2017, after which he suffered short term memory loss, trouble containing his emotions, and confusion.  (*Id*.)  On examination, Mr. Lovasz was alert and oriented, with normal cortical functions and speech.  (Tr. 829.)  His strength was normal in all extremities, but he had reduced pinprick sensation up to his mid calves and mid forearms bilaterally.  (*Id*.)  He ambulated with a boot due to the right foot fracture.  (*Id*.)  Dr. Sunshine ordered a brain MRI, lab work, and EEG imaging to address concussion and memory loss; he also planned to do NeuroTrax testing.  (Tr. 829-30.)  For polyneuropathy, Dr. Sunshine ordered lab work and a cervical spine MRI; he also continued Mr. Lovasz's existing medications.  (*Id.*)

The May 7, 2020 EEG was within normal limits (Tr. 604) and the May 27, 2020 brain MRI revealed inconsequential incidental findings without evidence of new or acute intracranial pathology (Tr. 708-09).

On May 11, 2020, Mr. Lovasz underwent computerized NeuroTrax cognitive testing. (Tr. 827, 1345-51.)  The BrainCare Data Report recorded: a global cognitive score of 56.3; a memory score of 65; an executive functioning (thinking) score of 62.1; an attention score of 49.9; a visual spatial score of 85.6; a verbal function score of 25; a problem solving score 38.3; and a working memory score of 67.9.  (Tr. 827, 1346-48.)  The Report stated that the "scores are standardized relative to cognitively healthy individuals of similar age and educational level" with a mean of 100 and a standard deviation of 15 (Tr. 1345), but contained the following disclaimer:

The information provided by NeuroTrax[TM] on the basis of cognitive testing is of a general nature and is not medical advice, a diagnosis, or treatment. The NeuroTrax[TM] Data Report does not constitute the practice of medicine, neuropsychology or the provision of professional health care advice. The Data Report is designed to provide information relating to brain wellness and is not intended to replace evaluation by a qualified medical professional, nor is it intended as the basis for medical diagnosis or treatment.

(Tr. 1350.)  Dr. Sunshine reviewed the results and found that they "revealed[] impairment[s] with [] working memory, memory, global cognitive score, [and] attention." (Tr. 827.)  His plan was to "discuss at follow up." (Tr. 827.)

Mr. Lovasz followed up with Dr. Sunshine on June 15, 2020, for concussion, memory loss, and weakness. (Tr. 831-33.)  He reported the following symptoms: headache, numbness or tingling, muscle weakness, loss of consciousness, memory or thinking problems, and trouble with walking or balance. (Tr. 831.)  He also noted difficulty performing the following activities of daily living: bathing, driving, cleaning, and shopping. (*Id*.)  On examination, he was alert and oriented with normal cortical functions and speech. (Tr. 832.)  He also had normal strength in all extremities, his sensory function was "normal to all modalities," and his reflexes were symmetric. (*Id*.)  Coordination and gait were also normal. (*Id*.)  Dr. Sunshine prescribed Pamelor for insomnia and ordered EMG/NCV imaging of the right upper and lower extremities for the discomfort in his feet. (*Id*.)  There is no notation of a discussion of the NeuroTrax test results, or further discussion of complaints of memory loss or concussion, but the record notes that the NeuroTrax report is in "edocs" with the EEG, MRI, and lab reports. (Tr. 831.)

On June 25, 2020, Mr. Lovasz underwent a rehabilitation and sports therapy physical therapy evaluation at Regional Hillcrest—Cleveland Clinic. (Tr. 1211.)  He reported unsteady gait and a history of diabetic neuropathy that worsened after being electrocuted in 2017. (Tr. 1212.)  He also reported right shoulder pain, decreased right upper extremity strength, and decreased balance. (*Id*.)  Four to eight sessions of physical therapy were recommended. (*Id*.)

At a July 13, 2020 post-surgical follow-up, Mr. Lovasz was six months post ORIF surgery.  (Tr. 865.)  He stated he was doing well and had no acute complaints, was back to full activity, and was wearing supportive shoes.  (*Id*.)  He noted occasional pain in his foot at times with "prolonged activity."  (*Id*.)  On examination, he was alert, oriented, and in no acute distress (Tr. 866).  He exhibited full strength in all areas.  (*Id.*)  At another follow-up in August 2020, Mr. Lovasz said he was doing well with no acute complaints and no pain.  (Tr. 1298.)  On examination, he was in no acute distress and displayed full strength in all areas.  (Tr. 1299.)

Mr. Lovasz saw podiatrist Dr. Levar on September 28, 2020, and reported no right foot pain when wearing his fracture boot.  (Tr. 1303.)  A CT of the right foot was performed on November 2, 2020.  (Tr. 1310.)  Ten months after his ORIF surgery, he continued to have a nondisplaced transverse right proximal fifth metatarsal fracture with only focal bony bridging, persistent fracture plane remained across much of the metatarsal shaft, broken central portion of the screw-plate plate, and possible split tear of the peroneous brevis tendon.  (Tr. 1310-11.)

On October 13, 2020, Mr. Lovasz underwent NCV/EMG testing of the right upper and right lower extremities with comparative nerve conduction studies of the left lower extremity.  (Tr. 1356.)  Testing revealed mild motor sensory peripheral neuropathy.  (*Id*.)  Mr. Lovasz saw Dr. Sunshine the same day for a post-EMG follow-up.  (Tr. 1323.)  He reported burning in his feet for the previous 10 years, with the right being worse than the left.  (*Id*.)  The EMG revealed "some evidence of reduced responses in the right lower extremity compared to the left."  (*Id*.)  On examination, Mr. Lovasz was alert and oriented and in no acute distress.  (*Id.*)  Cortical functions were normal.  (*Id*.)  He exhibited normal strength in all extremities, normal sensory function, and a normal gait.  (*Id.*)  Dr. Sunshine provided education on maintaining a healthy lifestyle and recommended follow up in three months.  (Tr. 1324.)

6

On October 26, 2020, Mr. Lovasz underwent a 65-hour ambulatory EEG with video, referred by Dr. Sunshine because of "burning [pain] in both feet for past ten years."  (Tr. 1383.) Kristen Smith, M.D., read the results, describing them as normal with no epileptiform discharges, EEG seizures, or lateralizing signs.  (*Id.*)

At a December 8, 2020 virtual appointment with Dr. Sunshine, Mr. Lovasz complained of continued memory issues.  (Tr. 1366.)  He also complained of feeling lightheaded when he got up, noting that he was diabetic and drank 18 oz. of Gatorade daily, and complained that taking Pamelor at night was keeping him up.  (*Id.*)  Dr. Sunshine recommended evaluation at the Brain Health Center for memory loss, noted that Mr. Lovasz "may have diabetic neuropathy," indicated that he would have Mr. Lovasz take Pamelor during the day to see if that helped, and noted that Mr. Lovasz would increase Gatorade for lightheadedness.  (*Id*.)

Mr. Lovasz had a regular check-up with Dr. Archacki on December 15, 2020, where he reported "not good" blood sugar levels when he tested at home, fair control of his neuropathy, and continuing memory loss.  (Tr. 1415.)  Physical examination findings were unremarkable but Dr. Archacki noted that he was nervous and anxious.  (Tr. 1417.)  Mr. Lovasz's bloodwork revealed an elevated A1C of 6.9, which was indicative of an increased risk for diabetes.  (Tr. 1424.)  Dr. Archacki noted that lifestyle changes would be beneficial.  (*Id*.)

Mr. Lovasz attended another virtual appointment with Dr. Sunshine on January 25, 2021, for follow up regarding memory loss.  (Tr. 1398.)  He noted continued memory issues or forgetfulness, like putting the food in the closet rather than the refrigerator and forgetting some cousins' names, and also reported two concussions in the past two years.  (*Id.*)  He had not had a sleep study; he called but never got a call back.  (*Id.*)  Dr. Sunshine noted that the brain MRI and bloodwork were okay, and that Mr. Lovasz would be seeing a doctor at the Brain Health Center

at University Hospitals.  (*Id.*)  Dr. Sunshine remarked that the etiology of Mr. Lovasz's memory loss was not clear but wondered if it could be "a combination of concussions and possibly sleep apnea."  (*Id.*)  He indicated that he would resend a sleep study referral.  (*Id.*)

Mr. Lovasz returned for an in-person examination with Dr. Sunshine on May 20, 2021, for follow up regarding his memory.  (Tr. 1406-07.)  He reported that he had not been able to schedule the sleep study, but "would still like to complete the testing if Dr. Sunshine fe[lt] it [wa]s appropriate."  (Tr. 1406.)  He noted that he was not tired and did not snore, felt "his memory ha[d] improved," and was "not mixing things up as much."  (*Id.*)  He still had to ice and stretch his feet for an hour, but was doing better overall "from a cognitive standpoint."  (*Id.*)  On examination, he was alert and oriented, his cortical functions and speech were normal, and he exhibited normal strength in all extremities, normal sensory function, normal coordination, and normal gait and station.  (Tr. 1406-07.)  As to memory loss, Dr. Sunshine indicated that he would hold off on the sleep study as Mr. Lovasz was "doing much better" and was "cognitively improving."  (Tr. 1407.)  He noted that Mr. Lovasz would be spending some time in Germany with his girlfriend in the winter, but would return in October or November before he left.  (*Id.*)

At a June 29, 2021 examination with Dr. Archacki, Mr. Lovasz was alert and oriented, had no sensory deficits, and had normal coordination.  (Tr. 1548.)  Dr. Archacki described Mr. Lovasz's diabetes as stable and noted that he filled out disability paperwork.  (Tr. 1546, 1548.)

On November 11, 2021, Mr. Lovasz presented to the Cleveland Clinic Neurological Institute for further evaluation of memory issues, attending a new patient evaluation with Carolyn Goldschmidt, D.O.  (Tr. 1611-17.)  He complained of memory issues starting 2.5 years before, noting that he had a terrible short-term memory and was not able to retain information, but had good long term memory.  (Tr. 1611.)  He first noticed the issue during an online training

course for work.  (*Id.*)  He could not multitask, put frozen food in the cabinet, and lost rent money.  (*Id.*)  He reported that Dr. Sunshine gave him a memory test, and that he did poorly on the test.  (Tr. 1611-12.)  He also reported that his doctors tried to decrease his gabapentin and venlafaxine to improve memory, but his neuropathic pain increased too much with no improvement in his memory.  (*Id.*)  He was alert and oriented on examination, with normal affect, language, attention, concentration, recent and remote memory, praxis, and intellectual function.  (Tr. 1614.)  His score on the Montreal Cognitive Assessment ("MoCA") was 27/30, suggestive of no cognitive impairment.  (*Id.*)  He also had full strength and normal coordination and gait on examination, with intact sensory perception to touch, but his standing balance and tandem walking were impaired and his sensory perception to vibration was diminished in the lower extremities.  (Tr. 1615-16.)  Dr. Goldschmidt noted that Mr. Lovasz's MoCA was "within normal range" but observed that the test was "probably not detecting the specific dysfunction that he has, which seems more of a processing speed/multi-tasking issue."  (Tr. 1617.)  She therefore recommended formal neurocognitive testing "to get a better handle on his specific impairments, in order to improve functioning," to be followed by cognitive therapy.  (*Id.*)  Mr. Lovasz was instructed to follow up in six months.  (*Id.*)

Mr. Lovasz attended a cognitive linguistic evaluation with speech language pathologist Marypatricia Honn, CCC-SLP at the Cleveland Clinic, on December 13, 2021.  (Tr. 1580).  Testing revealed a mild impairment in Mr. Lovasz's spoken language comprehension, spoken language expression, attention, memory, and problem solving.  (Tr. 1580-81.)  He was described as having "mild impairment" in the areas of spoken language comprehension, spoken language expression, attention, memory, and problem solving.  (Tr. 1580.)  His prognosis was "good," and SLP Honn recommended outpatient speech therapy and a home exercise program.  (*Id.*)

2.      **Function Report**

In an August 2020 function report, in response to the question of how his impairments prevented him from working, Mr. Lovasz asserted that he had "no feeling in [his] feet," which caused balance issues.  (Tr. 404.)  He said he experienced numbness when sitting and that he could not lift anything over five pounds.  (*Id*.)  Mr. Lovasz also described cognitive issues with respect to reading, understanding, and short-term memory loss.  (*Id*.)  He said he spent about 18 hours a day in bed.  (Tr. 405.)  He asserted that his impairments caused difficulties in the following areas of functioning:  lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair climbing, memory, completing tasks, concentration, understanding, following instructions, and using his hands.  (Tr. 409.)

Mr. Lovasz described cognitive issues with reading and understanding, and short term memory loss that made him unable to "remember what someone just said."  (Tr. 404.)  He could not pay attention because he would "drift in and out of anything I try to do." (Tr. 409.)  On an average day, he made breakfast, was in bed around 18 hours per day, iced his feet twice per day, did at-home rehabilitation stretches, and used a bone stimulator.  (Tr. 405.)  Pain kept him up at night, but personal care was not a problem.  (*Id*.)  He cooked on a Foreman grill, microwaved for food prep, and cooked for three days at a time.  (Tr. 406.)  His brother and mother helped him clean because his motion was too limited; he could not move around well enough to scrub or wipe.  (Tr. 406-07.)  He shopped on the internet once every two weeks for about 20 minutes. (Tr. 407.)  He could pay bills, count change, handle a savings account, and use a checkbook. (*Id*.)  He set alarms to remind him to attend to grooming and take his medicine.  (Tr. 406.)

His hobbies and interests included attending races, walking, playing basketball and camping, but he said that he was using a walker to walk and could not do the rest because he was

too weak.  (Tr. 408.)  He went on Facebook daily to socialize, but had not been out with people

since March; he was not comfortable going out alone and said he "no longer socialize[d] or

[went] out."  (Tr. 408-09.)  He reported that he did not finish what he started (*e.g.*, a

conversation, chores, reading, watching a movie), and could not follow written or spoken

instructions due to memory and comprehension issues.  (Tr. 409.)

### 3.    Opinion Evidence

#### i.    Consultative Examination

On September 9, 2020, Mr. Lovasz participated in a consultative psychological

examination via the doxy.me telehealth platform with Regina McKinney, Psy.D. (Tr. 1289-94.)

The examination consisted of a clinical interview, with no medical records reviewed.  (Tr. 1290.)

No psychological testing was requested or conducted.  (Tr. 1292.)

When asked about the nature of his disability, Mr. Lovasz stated he was electrocuted four

years prior and had a "plethora of issues since then," including operations on both shoulders,

multiple concussions, no feeling in his foot, and breaking his foot.  (Tr. 1291.)  He reported that

he had recently taken cognitive tests and "didn't do very well on that."  (*Id.*)  He expressed

concerns about work limitations, including standing or sitting for extended periods, tiredness and

fatigue, maintaining pace, attending consistently to work duties, and concentrating.  (Tr. 1291.)

As to his mental health, Mr. Lovasz was receiving medication services from his primary

care provider, but was not being treated by mental health professionals.  (Tr. 1291.)  He took

venlafaxine (Effexor), but was not sure if it was beneficial.  (*Id.*)  He complained of depressive

symptoms, low motivation, irritability, poor concentration, and social withdrawal.  (*Id.*)

In terms of daily activities, Mr. Lovasz said he could attend to grooming and hygiene

without difficulty, but had difficulty completing chores and preparing meals due to problems

with his physical functioning and motivation.  (Tr. 1291).  He could pay bills and had regular contact with family.  (*Id*.)  He also watched television and read.  (*Id*.)

On examination, his grooming and hygiene appeared adequate and he did not appear to be in physical discomfort, but he was only partially visible and there were technology limitations. (Tr. 1291-92.)  He was cooperative, with an adequate level of understanding and consistent eye contact.  (*Id.*)  He was able ot track the conversation without significant difficulty and his speech was within normal limits.  (Tr. 1292.)  He presented as depressed with a flattened affect, and displayed limited energy to complete the evaluation process, appearing tired.  (*Id.*)  But he was alert, responsive, and fully oriented, and recalled personal historic information without difficulty. (*Id*.)  His level of intellectual functioning appeared to fall within normal limits.  (*Id*.)

Dr. McKinney diagnosed Mr. Lovasz with major depressive disorder and unspecified trauma related disorder (Tr. 1293), and offered the following functional assessment:

- <u>Understanding, carrying out, and remembering instructions</u>: "[His] performance on a brief word reasoning task was not suggestive of difficulty understanding instructions. His performance on a brief short term memory task was suggestive of difficulty remembering instructions. He did not have difficulty understanding and responding to questions posed during the examination today. He did not report problems learning work tasks." (*id.*);

- <u>Sustaining concentration and persisting in work-related activities</u>: "[He] was able to follow the conversation during the interview and did not ask for regular repetition of questions. He had difficulty completing tasks assessing attention during the evaluation which suggests difficulty with concentration and focus. His level of energy was below average today and problems with motivation completing basic tasks of daily living were noted. He reported a history of problems with concentration in work settings which negatively affected completion of work duties." (*id.*);

- <u>Social interaction with supervisors, coworkers, and the public</u>: "[He] presented as depressed which may impact interpersonal interaction in work settings including limited or negative social interaction. He reported problems with anxiety which contributed to social avoidance. He did not present with intellectual limitations which would impact his ability to understand and respond to supervisory feedback. He did not report significant problems with social interaction in work settings." (Tr. 1293-94); and

12

- Dealing with normal pressures in a work setting: "[He] presented as emotionally overwhelmed when discussing current pressures which may impact his mood stability in a competitive work setting. He reported problems managing pressure in daily activities which has contributed to avoidance completing daily tasks. His presentation was not indicative of intellectual or cognitive limitations which would impact his ability to manage normal work pressures. He did not describe a history of difficulty managing normal pressure in work settings." (Tr. 1294).

### ii.     State Agency Medical Consultants

Upon initial review, on August 12, 2020, state agency medical consultant Abraham Mikalov, M.D., completed a physical RFC assessment opining that Mr. Lovasz could: perform light work; frequently climb ramps / stairs, stoop, kneel, crouch, and crawl; and occasionally climb ladders / ropes / scaffolds.  (Tr. 263-65.)  He should also avoid all exposure to hazards such as dangerous/heavy machinery, commercial driving, and unprotected heights.  (Tr. 264.)

Upon reconsideration, on January 2, 2021, state agency psychological consultant Leslie Green, M.D., agreed with Dr. Mikalov's opinion, except that she added the following additional limitations: never climb ladders / ropes / scaffolds; and avoid concentrated exposure to extreme heat, extreme cold, and vibration.  (Tr. 273-74.)

### iii.     State Agency Psychological Consultants

Upon initial review, on September 27, 2020, state agency psychological consultant Jennifer Whatley, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 262-63) and Mental RFC Assessment (Tr. 265-66).  In the PRT, Dr. Whatley found that Mr. Lovasz had moderate limitations in: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself.  (Tr. 262.)  In the mental RFC, Dr. Whatley opined that Mr. Lovasz could: remember and understand 1-2 step repetitive instructions; carry-out and maintain pace to complete 1-2 step repetitive tasks; interact superficially in the workplace; and work in a routine environment where changes are explained in advance.  (Tr. 265-66.)  Dr. Whatley further explained that Mr. Lovasz required

13

repetitive or short cycle work, and "should avoid variety of work, close tolerances, set limits, and standards, and dealing with people beyond just getting instructions."  (Tr. 266.)

Upon reconsideration, on December 31, 2020, state agency psychological consultant Arcelis Rivera, Psy.D., agreed with Dr. Whatley's PRT (Tr. 271-72) and RFC (Tr. 274-76).

### iv.    Treating Provider

<u>Physician Statements</u>

Mr. Lovasz's primary care provider, Dr. Archacki, completed an Attending Physician Statement on May 29, 2020.[1]  (Tr. 608-09.)  In it, he noted diagnoses of neuropathy in feet, memory loss, and shoulder pain.  (Tr. 608.)  Subjective symptoms included chronic pain, memory loss, and degenerative joint disease.  (Tr. 609.)  Dr. Archacki opined the claimant could never sit, stand, walk, bend, stoop, climb, squat, reach above shoulder, or drive.  (*Id.*)

Dr. Archacki completed a subsequent Physician Statement about seven months later, on December 15, 2020.  (Tr. 1395-96.)  He noted diagnoses of neuropathy, syncope, and bilateral foot fractures, and noted that labs confirmed diabetes.  (Tr. 1395.)  The only subjective symptom noted was pain.  (*Id.*)  Dr. Archacki opined that Mr. Lovasz was homebound, and could never bend, stoop, climb, squat, reach above shoulder, or drive.  (Tr. 1396.)  He also indicated that there was a cognitive deficit that impaired functional capacity: short-term memory loss.  (*Id.*)  Dr. Archacki did not expect Mr. Lovasz's condition to improve in the future.  (*Id*.)

<u>Off-Task/Absenteeism Questionnaire</u>

Dr. Archacki completed an "Off-Task / Absenteeism Questionnaire" generated by the office of Mr. Lovasz's attorney on January 27, 2021.  (Tr. 1400-01.)  Dr. Archacki checked "Yes" in response to a question asking whether Mr. Lovasz was likely to be off task at least 20%

---

[1] As the ALJ acknowledged (Tr. 74), this opinion is hard to read because of the low-quality photocopy in the record.

of the time.  (Tr. 1401.)  He then provided hand-written responses to several specific inquiries regarding the bases for this opinion, as follows:

- Underlying mental or physical impairment(s)s established by objective and clinical findings: *Diabetic Neuropathy*;

- Inability to concentrate, pay attention and/or focus on a sustained basis: *Post concussion Syndrome*;

- Pain (location of pain): *feet*;

- Drowsiness and/or need to lie down and rest or sleep: *may be random*;

- Side effects of medications: *Sedation*;

- Other reason(s): *Please send notes on vocation rehab that you may have advised to assess abilities*.

(Tr. 1401 (hand-written language in italics).)  Dr. Archacki also checked boxes indicating that Mr. Lovasz's impairments or treatment would cause him to be absent from work about four times per month, and that the severity of his limitations existed since December 15, 2019.  (*Id*.)

### 4.    Hearing Testimony

#### i.    Plaintiff's Testimony

Mr. Lovasz appeared for a telephonic hearing on January 22, 2022 (Tr. 85-124), where he was represented by counsel (Tr. 88).  Mr. Lovasz had a driver's license and said he drove about once a week, usually a short trip of 15-20 minutes to the store, and did not drive at night.  (Tr. 91.)  He drove sparingly due to neuropathy in his feet.  (*Id*.)  He reported struggling with word finding, also known as anomia. (Tr. 97.)  He felt like everything was moving in slow motion when he tried to speak, and struggled to remember what he was told during a conversation.  (Tr. 98.)  Those issues affected his ability to perform his last job as a salesclerk at Verizon.  (Tr. 98-99.)  He also lost things, like money his brother gave him to pay his rent.  (Tr. 99.)

15

Mr. Lovasz dealt with either pain and swelling or loss of feeling in his feet daily.  (Tr. 99.)  That made it difficult to stand and balance.  (*Id.*)  He originally broke his foot due to loss of balance.  (Tr. 100.)  His foot fracture was not fully healed after two years due to a lack of blood flow in his feet.  (*Id.*)  He iced his feet twice per day and spent most of the day in his bed with his feet elevated to try to control the swelling.  (Tr. 100-01.)  He also elevated his feet to counteract numbness and tingling.  (*Id.*)  Mr. Lovasz could walk for 30 minutes before needing to ice and elevate his feet for 15-20 minutes.  (Tr. 110.)  He also struggled to sit for long periods of time because his legs would go numb from the shins down.  (Tr. 112.)  He needed to use his scooter or walker to assist with balance when standing up from a seated position.  (Tr. 112-13.)  Mr. Lovasz's right foot is more painful than his left.  (Tr. 115-16.)

> Mr. Lovasz described difficulty using his dominant right hand since he was electrocuted:
>
> So when I got shocked, like my hand was in a claw, basically, for about four months, four or five months. And so then through therapy, I've been able to open the hand[] but I don't have any strength in there. So like I have issues like holding anything or writing anything.
>
> At work, like I dropped the tablet all the time or I'd drop a phone. And it's just very sporadic as far as like when my hand decides not to work, like it could be working and then all of a sudden it's not.
>
> Even like pretty much like gripping anything, like cooking in the kitchen, like it's really tough now, like holding a pan, holding a knife, things like that. So like any food or anything like that that I prepare, like I have to make sure that my brother's home because I just, I don't know, I'm always worried about like dumping something on me.

(Tr. 106-07.)  Mr. Lovasz reported side effects of drowsiness and fatigue from his gabapentin and anxiety medicines.  (Tr. 113.)  His doctors told him that his neuropathy is likely to worsen over time.  (Tr. 114.)  Both of his feet were equally painful but his right foot had more nerve damage.  (Tr. 115-16.)  The pain was present every day, but sometimes his feet were numb instead of painful.  (Tr. 116.)

### ii.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 117-124.)  He testified that a hypothetical individual of Mr. Lovasz's age, education, and work experience, with the functional limitations described in the RFC determination, could not perform Mr. Lovasz's past work (Tr. 119), but could perform representative positions in the national economy, like marker, produce weigher, bagger/laundry (Tr. 119-20)  If the person would be absent more than one day per month on an ongoing basis, or off-task more than 10% of the time, the VE testified that would preclude competitive employment.  (Tr. 122.)

### III.  Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

## IV.    The ALJ's Decision

In his December 7, 2021 decision, the ALJ made the following findings:[2]

1.    The claimant met the insured status requirements of the Social Security Act through December 31, 2025. (Tr. 63.)

2.    The claimant had engaged in substantial gainful activity since December 15, 2019, the application date. (*Id.*)

3.    The claimant had the following severe impairments: open reduction internal fixation (ORIF) 5th metatarsal fracture, history of nonunion and interval breakage of hardware in right foot, osteopenia; history of concussions with memory loss; mild cognitive impairment; diabetes mellitus; polyneuropathy; degenerative disc disease of the cervical spine; major depressive disorder (MDD); trauma related disorder; anxiety with depression; left shoulder status-post surgery (arthroscopic capsular release

---

[2] The ALJ's findings are summarized.

and bicep tenotomy) left shoulder impingement; right shoulder adhesive capsulitis and bicipital tendinitis and impingement, superior labral tear, status-post surgery (arthroscopic pancapsular release; arthroscopic biceps tenotomy; subacromial decompression; arthroscopic extensive debridement); and electrocution.  (Tr. 63.)

4.      The claimant did not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 64.)

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: He can frequently handle, finger, and feel on the right.  He can frequently reach in all directions with the bilateral upper extremities.  He can frequent use bilateral foot controls.  He can frequently climb ramps and stairs.  He can frequently stoop, kneel, crouch, and crawl.  He can never climb ladders, ropes, or scaffolds.  He must avoid concentrated exposure to extreme cold, extreme heat, and vibrations.  He must avoid concentrated exposure to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle.  He has the ability to carry out, concentrate, persist, and maintain pace for completing simple, routine, and repetitive tasks.  He can have superficial interaction with coworkers and the public.  Superficial interaction is defined as work that does not involve any work tasks such as arbitration, negotiation, confrontation, being responsible for safety of others, or directing work of others never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, frequently stoop, kneel, crouch and crawl; avoid all exposure to hazardous machinery and unprotected heights; no commercial driving, never operate foot controls; can understand, remember, and carry out simple instructions; Perform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained. (Tr. 68.)

6.      The claimant is unable to perform any past relevant work.  (Tr. 77.)

7.      The claimant is currently a younger individual.   (Tr. 78.)

8.      The claimant has at least a high school education.  (*Id.*)

9.      Transferability of job skills is not material to the determination of disability.  (*Id.*)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (*Id.*)

Based on the foregoing, the ALJ determined that Mr. Lovasz had not been under a disability, as defined in the Social Security Act, from the alleged disability onset date through the date of the decision.  (Tr. 79.)

## V.     Plaintiff's Arguments

Mr. Lovasz argues that the ALJ's RFC is not supported by substantial evidence because her evaluation of Dr. Archacki's Off-Task / Absenteeism Questionnaire did not comply with the controlling regulation for evaluating medical opinion evidence.  (ECF Doc. 8, p. 1.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

(citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    Sole Assignment of Error: Whether ALJ Erred in Assessing Persuasiveness of Off-Task / Absenteeism Questionnaire from Dr. Archacki**

In his sole assignment of error, Mr. Lovasz argues that the ALJ's decision was not supported by substantial evidence because her evaluation of Dr. Archacki's Off-Task / Absenteeism Questionnaire (hereinafter "Questionnaire") did not abide by the governing regulation for evaluating medical opinion evidence.  (ECF Doc. 8, pp. 1, 13-23.)  The

Commissioner argues in response that the ALJ's evaluation of the Questionnaire was supported by substantial evidence.  (ECF Doc. 10, pp. 10-18.)

### 1.  Framework for Evaluation of Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

## 2.      Whether ALJ Erred in Assessing Persuasiveness of Questionnaire

The ALJ evaluated the persuasiveness of the Questionnaire as follows:

Dr. Archacki completed an Off-Task/Absenteeism Questionnaire on January 27, 2021 [].  The claimant has diabetic neuropathy. He has an inability to concentrate, pay attention, and/or focus on a sustained basis due to post-concussion syndrome. He has pain in his feet. He has random drowsiness. A side effect of medication includes sedation. Due to his impairments or treatments, he would be absent from work about 4 times a month. The severity of his limitations have existed since at least December 15, 2019. The undersigned finds these limitations unpersuasive because they are extreme and are not consistent with or supported by the preponderance of the evidence. On May 20, 2021, it was noted that the claimant was improving cognitively. On June 29, 2021, examination noted no sensory deficits. He had diminished sensory in the bilateral lower extremities on November 2, 2021. On December 31, 2021, it was noted that the claimant had a mild cognitive impairment. The claimant reported he can pay bills, watch TV, manage funds, and use the internet and all of these require the ability to concentrate, pay attention and focus.

(Tr. 75 (citations omitted) (emphasis added).)

Mr. Lovasz acknowledges the medical records and activities of daily living highlighted by the ALJ, but argues that the ALJ failed to properly analyze the opinion because she: (1) "comparably failed to provide an accurate recitation of the alleged inconsistencies between Plaintiff's activities of daily living and Dr. Archacki's opinion," effectively mischaracterizing the records; (2) cherry-picked the records when she referred to findings of "mild cognitive impairment" without acknowledging "objective neuropsychological testing . . . indicating of severe cognitive deficits"; (3) reviewed the record "in a highly selective manner" when she noted a finding of "no sensory deficits" despite other record findings reflecting a loss of sensation; and (4) focused on diabetic neuropathy in analyzing Dr. Archacki's opinion, when Mr. Lovasz also had foot pain related to his podiatric impairments.  (ECF Doc. 8, pp. 17-22.)  The Court will address the arguments in turn, although all appear to turn on a contention of "cherry-picking."

An ALJ may not cherry pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.  *See, e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d

708, 724 (6th Cir. 2014); *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013). However, "an ALJ does not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Solembrino v. Astrue*, No. 1:10–cv–1017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011).  Indeed, arguments that an ALJ has cherry picked evidence are "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) (citing *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009)).

### i.    Whether ALJ Mischaracterized Activities of Daily Living

Mr. Lovasz's first argument focuses on the ALJ's observation that: "The claimant reported he can pay bills, watch TV, manage funds, and use the internet and all of these require the ability to concentrate, pay attention and focus." (Tr. 75.)  He speculates that this finding references an August 2020 function report where Mr. Lovasz also reported cognitive issues, short term memory loss, shopping via the internet, difficulty paying attention, and failing to finish what he started.  (ECF Doc. 8, p. 17 (citing Tr. 404-11).)  He argues that the limited activities he reported in the function report are consistent with Dr. Archacki's opinion that he would be off task for at least 20% of the workday.  (*Id.* at p. 18.)  In support, he cites to an unpublished decision under the prior regulatory standard, where the court found: "to the extent the ALJ relies solely on a claimant's self-reported daily activities to discredit the medical opinion of her treating physician, the recitation of said activities should, at the very least, be thorough and accurate."  (*Id.* (quoting *Melendez v. Comm'r of Soc. Sec.*, 2014 WL 2921938, at *6-8 (N.D. Ohio June 27, 2014).)  The Commissioner responds that Mr. Lovasz's daily activities "were only one reason among others cited for finding Dr. Archacki's opinions unpersuasive" and further that it was sufficient that the ALJ acknowledged his statements to providers regarding his difficulties with daily activities within the decision as a whole.  (ECF Doc. 10, pp. 16-17.)

24

A review of the decision reveals that the ALJ specifically discussed Mr. Lovasz's self-reported activities of daily living in her listings analysis (Tr. 67), her subjective symptom analysis (Tr. 69), and in her summaries of the treatment records (Tr. 70-73) and the consultative psychological examination (Tr. 74-75), before she highlighted some of those activities in support of her persuasiveness analysis for the Questionnaire (Tr. 75).  She acknowledged his complaints of cognitive issues, short-term memory loss, word-finding issues, losing things, and his shopping via computer, but found "the objective evidence does not support his contentions regarding the severity, chronicity and/or frequency of his symptoms."[3]  (Tr. 69.)  The ALJ also explicitly cited to records indicating—consistent with her findings in the persuasiveness analysis—that Mr. Lovasz reported he could pay bills and manage his funds, that he shopped via computer, and that he watched television.  (*See* Tr. 69 (citing Tr. 404-11)); Tr. 74 (citing Tr. 1289-94).)

Thus, the ALJ considered Mr. Lovasz's self-reported limitations, found the objective evidence did not support his contentions regarding the severity, chronicity, or frequency of his symptoms, and accurately described his self-reported activities in support of the persuasiveness analysis.  Mr. Lovasz has failed to demonstrate that the ALJ mischaracterized or "cherry-picked" records relating to his activities of daily living in support of her persuasiveness analysis.

Mr. Lovasz's citation to *Melendez*, 2014 WL 2921938, does not change this analysis.  Not only was that case decided under the now-inapplicable "good reasons" standard for treating physician opinions that were given deference under the prior regulations, but the court in *Melendez* explicitly noted that the ALJ had "relie[d] *solely* on [the] claimant's self-reported daily activities to discredit the medical opinion of her treating physician[.]"  2014 WL 2921938, at *6-7 (emphasis added).  Here, in contrast, the ALJ found Dr. Archacki's opinion to be "extreme"

---

[3] Mr. Lovasz does not challenge the ALJ's subjective symptom analysis in the present appeal.

and "not consistent with or supported by the preponderance of the evidence" based on subjective and/or objective observations at four separate medical treatment visits, by way of example, in addition to the activities of daily living discussed above.  (Tr. 75.)

For the reasons set forth above, the Court finds Mr. Lovasz has not met his burden to show that the ALJ's description of his activities of daily living mischaracterized the record or otherwise deprived the ALJ's persuasiveness analysis of the support of substantial evidence.

### ii.    Whether ALJ Ignored Records Regarding Cognitive Impairment

Mr. Lovasz's second argument focuses on the observation: "On December 31, 2021, it was noted that the claimant had a mild cognitive impairment." (Tr. 75.)  Mr. Lovasz argues that his neurologist, Dr. Goldshmidt, reviewed the relevant finding of mild impairment—which was made by a speech language pathologist in a cognitive linguistic evaluation—and opined that the testing was "probably not detecting the specific dysfunction that [Mr. Lovasz] has, which seems more of a processing speed/multi-tasking issue."  (ECF Doc. 8, p. 20 (citing Tr. 1580-81).)  Mr. Lovasz then argues that the ALJ erred when she cited to that mild cognitive impairment finding without also discussing his 2020 NeuroTrax test results, which he characterized as "objective neuropsychological testing. . . indicative of severe cognitive deficits" and "highly relevant to determining Plaintiff's true functioning."  (*Id.* at pp. 20-21 (citing (Tr. 827, 1345-48).)

A review of the records cited by Mr. Lovasz raises several concerns regarding the clarity and accuracy of his characterizations.  First, Dr. Goldschmidt's observations in November 2021 that certain cognitive findings were "within the normal range" but "probably not detecting the specific dysfunction that [Mr. Lovasz] has" (Tr. 1614, 1617) did *not* refer to the cognitive linguistic evaluation findings of mild impairment referenced by the ALJ.  Instead, Dr. Goldschmidt referred to the Montreal Cognitive Assessment (MoCA) she performed at that November 2021 treatment visit, which was suggestive of no cognitive impairment.  (*Id.*)  Dr.

Goldschmidt did then recommend formal neurocognitive testing, followed by cognitive therapy (Tr. 1617), and it was a month later that Mr. Lovasz attended the cognitive speech evaluation with SLP Honn that revealed the mild impairment noted by the ALJ in her analysis (Tr. 1580-81).  Thus, Mr. Lovasz's assertion that Dr. Goldschmidt reviewed SLP Honn's findings of mild impairment and *then* opined that further testing was required, concluding those findings probably did not detect Mr. Lovasz's specific dysfunction, is inaccurate and not supported by the record.

Second, Mr. Lovasz's characterization of the NeuroTrax test results as "objective neuropsychological testing that was . . . indicative of severe cognitive deficits with standardized scores ranging from two to 5 standard deviations below the mean" that were "according to Dr. Goldschmidt, highly relevant to determining Plaintiff's true functioning" (ECF Doc. 8, pp. 20-21) also does not appear consistent with the record.  Dr. Sunshine's only findings regarding the NeuroTrax results were that they "revealed[] impairment[s] with [] working memory, memory, global cognitive score, [and] attention."  (Tr. 827.)  He did not find a "severe cognitive deficit." (*Id.*)  Instead, Mr. Lovasz extrapolates a finding of severe impairment from the test results themselves, even though the test report contains clear disclaimers that the results are not "medical advice" or "a diagnosis" and that the report "does not constitute the practice of medicine, neuropsychology or the provision of professional health care advice," and "is not intended to replace evaluation by a qualified medical professional, nor is it intended as the basis for medical diagnosis or treatment."  (Tr. 1350.)  The record thus does not bear out Mr. Lovasz's characterization of the NeuroTrax testing as equivalent to "formal neurocognitive testing," as contemplated by Dr. Goldschmidt, or "objective neuropsychological testing . . . indicative of severe cognitive deficits."  (ECF Doc. 8, p. 21.)

Nevertheless, the ALJ provided a detailed discussion of Mr. Lovasz's treatment with Dr. Sunshine, including acknowledging that: "NeuroTrax on May 11, 2020, noted cognitive testing revealed impairment with working memory, memory, global cognitive score, and attention."  (Tr. 71-73.)  This general finding of impairment is consistent with Dr. Sunshine's stated findings regarding the NeuroTrax results.  (Tr. 827.)  The ALJ also acknowledged in her summary of Dr. Sunshine's records that Mr. Lovasz continued to complain of memory issues at his treatment visits, but also noted (accurately) that Mr. Lovasz's brain MRI findings were unremarkable, his EEG was within normal limits, he was alert and oriented on examination, his cortical functions and speech were normal, and he reported in May 2021 that his memory had improved and he was doing better from a cognitive standpoint.  (Tr. 71-73.)

In the relevant persuasiveness analysis, the ALJ noted both the findings of mild cognitive impairment in December 2021 and Mr. Lovasz's own report to Dr. Sunshine in May 2021 that he was improving cognitively.  (Tr. 75.)  While she did not include further discussion of the NeuroTrax findings in this analysis, she was not required to "reproduce the list of [] treatment records a second time when she explained why [the] opinion was inconsistent with this record." *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) 7 (citing *Forrest*, 591 F. App'x at 366); *Bledsoe*, 165 F. App'x at 411.  Further, Ms. Lovasz has failed to show that the ALJ's earlier characterization of the NeuroTrax records was inaccurate, or that further discussion of that record was necessary to ensure that the analysis was supported by substantial evidence.

For the reasons set forth above, the Court finds Mr. Lovasz has not met his burden to demonstrate that the ALJ's discussion of his cognitive impairment mischaracterized the record or otherwise deprived the ALJ's persuasiveness analysis of the support of substantial evidence.

### iii.       Whether ALJ Ignored Evidence Regarding Physical Impairments

Mr. Lovasz's final arguments focus on the ALJ's observations that: "On June 29, 2021, examination noted no sensory deficits.  He had diminished sensory in the bilateral lower extremities on November 2, 2021."  (Tr. 75.)  Mr. Lovasz argues that the ALJ reviewed the record "in a highly selective manner" when she: noted a finding of "no sensory deficits" despite records reflecting a loss of sensation; and focused on diabetic neuropathy when Mr. Lovasz also had foot pain related to his podiatric impairments.  (ECF Doc. 8, pp. 21-22.)

In her decision, the ALJ acknowledged Mr. Lovasz's complaints of neuropathy and foot pain that interfered with balancing, standing, and walking (Tr. 69) and summarized the treatment records relating to his broken foot with non-union, ORIF surgery, and neuropathy (Tr. 69-73). The summary accurately noted that some physical examinations revealed reduced sensation and others revealed normal sensation.  (*See, e.g.,* Tr. 71 (4/30/20, reduced sensation); Tr. 71 (5/20/21, sensation intact).)  The ALJ also noted EMG findings consistent with mild motor sensory peripheral neuropathy.  (Tr. 72.)  It is in the context of this earlier discussion that the ALJ made the further observations in her persuasiveness analysis that physical examinations in June and November 2021 revealed no sensory deficits and diminished sensation respectively.  (Tr. 75.) The ALJ's characterizations of the two records were accurate.  (*See* Tr. 1548, 1615-16.)

Mr. Lovasz's argument that the ALJ reviewed the record "in a highly selective manner" when she noted a finding of "no sensory deficits" in her persuasiveness analysis (ECF Doc. 8, p. 21) lacks merit.  Not only did the ALJ acknowledge earlier in her decision that there was objective evidence of sensory deficits in the lower extremities (Tr. 71, 72), she also acknowledged that same fact in the sentence immediately following her description of the record noting no sensory deficits (Tr. 75).

Mr. Lovasz's underdeveloped argument that the ALJ also erred because he did not specifically discuss her right foot fracture in light of Dr. Archacki's hand-written note identifying "foot" as the site of his pain must also fail.  As noted above, the ALJ was not required to "reproduce the list of [] treatment records a second time when she explained why [the] opinion was inconsistent with this record."  *Crum*, 660 F. App'x at 457.  The ALJ discussed the treatment relating to Mr. Lovasz's broken foot, non-union, and ORIF surgery at length in the decision.  (Tr. 69-73.)  Mr. Lovasz's conclusory argument that the ALJ did not consider those impairments, or related treatment, because the ALJ did not specifically discuss them in her persuasiveness analysis is not well taken.

In addressing the ALJ's persuasiveness findings, the Court notes that the ALJ did not wholly discount Dr. Archacki's opinion that Mr. Lovasz may be off task due to his neuropathy, pain, and/or post-concussion syndrome.  While she found his opinion regarding the extent of Mr. Lovasz's limitations to be "extreme" (Tr. 75), she nevertheless adopted an RFC that limited him to light work with restrictions in climbing, postural positions, and the use of his arms and legs, limited exposure to heat, cold, and vibrations, precluded exposure to hazards, and further limited him to simple, routine, repetitive tasks with no more than superficial interaction. (Tr. 68.)

Ultimately, even if a preponderance of the evidence supports a finding that Dr. Archaki's medical opinion is persuasive, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Regardless of whether there was evidence to support the off-task and absenteeism limitations set forth in the Questionnaire, the question before this Court is whether there was substantial evidence to support the ALJ's finding to the contrary.

Upon consideration of the ALJ decision and the evidentiary record, the Court finds that the ALJ considered the full record in evaluating the persuasiveness of the medical opinion, appropriately articulated her reasons for finding the opinion unpersuasive, and made a determination that was supported by substantial evidence.  Mr. Lovasz has not met his burden to show that the ALJ mischaracterized the records or failed to consider the entire record when evaluating the persuasiveness of Dr. Archacki's medical opinion, or to show that the ALJ's persuasiveness finding otherwise lacked the support of substantial evidence.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

September 24, 2024

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge